Nusbaum v 1455 Wash. Ave. LLC (2025 NY Slip Op 50023(U))

[*1]

Nusbaum v 1455 Wash. Ave. LLC

2025 NY Slip Op 50023(U)

Decided on January 13, 2025

Supreme Court, Saratoga County

Kupferman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on January 13, 2025
Supreme Court, Saratoga County

David W. Nusbaum, Plaintiff,

against
1455 Washington Avenue LLC, 7-ELEVEN, INC, and 
 MC GROUP/ICON d/b/a STRATUS, Defendants.
STRATUS UNLIMITED, LLC, d/b/a STRATUS s/h/a MC GROUP/ICON d/b/a STRATUS, Defendant/Third-Party Plaintiff,
against
TOP LINE LTD, INC. d/b/a AJ SIGN CO., Third-Party Defendant.

Index No. EF2021562

Peter J. Hickey, Esq.
Peter P. Balouskas, Esq.
Harding Mazzotti, LLP
1 Wall Street, P.O. Box 15141
Albany, New York 12212
Attorneys for the Plaintiff,
David W. Nusbaum
Nicole Licata-McCord, Esq.
Sobel Pevzner LLC
464 New York Avenue, Suite 100
Huntington, New York 11743
Attorneys for Defendants,
1455 Washington Avenue LLC and 7-Eleven, Inc. 
Scott W. Bush, Esq.
Corrigan, McCoy & Bush, PLLC
220 Columbia Turnpike 
Rensselaer, New York 12144
Attorneys for Defendant/Third-Party Plaintiff
Stratus Unlimited, LLC d/b/a Stratus s/h/a MC Group/Icon d/b/a Stratus
Keith Frary, Esq.
Law Office of Santacrose, Frary, Tomko & Whiting 
500 Seneca Street, Suite 307A
Buffalo, New York 14204
Attorneys for Third-Party Defendant,
Top Line Ltd., Inc. d/b/a AJ Sign Co.

Richard A. Kupferman, J.

The plaintiff fell from an A-frame ladder while applying tape to a small area of a building. This work was being performed to prepare the area for painting and in connection with the installation of a new sign at a convenience store leased by a commercial tenant. The tenant made the request for the sign to be replaced through a project management firm (LSI), which then requested another entity, the defendant Stratus, to perform the work and/or arrange for the work to be performed. Stratus selected the plaintiff's employer, AJ Sign, to perform the work. 
The complaint asserts four causes of action (including a Labor Law § 240 claim) against three defendants, namely, the title owner of the premises, the tenant, and Stratus. The title owner and the tenant have asserted cross claims against Stratus for indemnification and contribution, and Stratus has filed a third-party complaint against AJ Sign for contractual indemnification, among other things. During the litigation, Stratus sought summary judgment in its favor, seeking to dismiss the claims against it on the ground that it was not a proper party (i.e., an owner, general contractor, or their agent) and neither controlled nor supervised the work. The Court denied the motion. On that motion, no other issues were raised or decided, and the plaintiff did not cross-move for any relief against Stratus. 
After filing the note of issue, the plaintiff now seeks partial summary judgment on the Labor Law § 240 claim as against the title owner and the tenant. These defendants do not dispute that the plaintiff was engaged in a protected activity (i.e., the painting and altering of a building) or that the title owner is a proper party. Rather, they contend that issues of fact exist as to whether the tenant is a proper party; whether the ladder provided proper protection; and whether the plaintiff's alleged misuse of the ladder was the sole proximate cause of his injuries. Neither Stratus nor AJ Sign submitted any responsive papers, as the motion did not seek any relief against them. 
At oral argument, the Court rejected, as lacking in merit, the tenant's contention that it was not a proper party. The Court inquired about whether the plaintiff had misused the ladder, and whether the outcome of the motion would be binding on Stratus, given that the plaintiff did not request any affirmative relief against it. Stratus' counsel disputed that the decision would be binding on Stratus, whereas the plaintiff's counsel did not appear to take a contrary position. At [*2]the conclusion of the oral argument, the Court reserved decision. 
The summary below sets forth the relevant facts on the issues of proper protection and sole proximate causation. These facts have been taken from the deposition transcripts of the plaintiff and his co-worker (Garrett), as well as the expert affidavits submitted on the motion. The summary also discusses the incident report and photographs reviewed by the plaintiff during his deposition. 
 The Plaintiff's Deposition Testimony
The plaintiff testified that he began working at AJ Sign as a vinyl graphics technician in July 2020. He worked at least five days a week, 8-10 hours a day. When asked about his general duties, the plaintiff explained that he prepared and installed vinyl graphics. Some days he would work on vinyl-related tasks onsite, and other days they would assign him another task or job offsite. By the time of the accident, he had worked with approximately 10 different people from AJ Sign to perform off-site sign installations. He would travel off-site to install a sign a couple of times a week. He explained that he would generally prepare the area prior to the installation and then assist with the sign installation. He considered himself as more of a helper.
The plaintiff explained that AJ Sign had several vehicles, including vans and trucks. AJ Sign provided ladders and "things like that" for the work. It had multiple ladders, maybe 10, kept at its headquarters. He was not aware if AJ Sign had any scaffolding materials. He never used any scaffolding when installing a sign. He believes that AJ Sign had a van with a boom on it, and a couple of crane trucks as well. He used a lift one time at a jobsite. He believes AJ Sign rented it. At times, he was provided with a hardhat, and there were also safety glasses. He believes there was a harness for the lift, but that was the only harness of any sort.
When asked about training, the plaintiff explained that he received a 10-hour certificate from an OSHA online course (August 27, 2020). At his deposition, he could not recall the details of the course. He explained that he took the course at home and "was kind of instructed to just click through the course to get the certificate." He testified that he did not receive any other formal training sessions during his employment, but he watched others perform the work. 
At the time of the accident (December 2020), the plaintiff was familiar with the type of ladder from which he fell. He would use this type of ladder a few times a week. He felt comfortable using this type of ladder and never had any other prior difficulties with it. He did not have any prior falls or complaints. 
The plaintiff explained that the ladder could be used as either a stepladder (A-shape) or as an extension ladder, although he had never used it as an extension ladder. He had used it only as a stepladder. He was aware that the height of the ladder could be increased by adjusting the length of the legs on the ladder. He believed that the ladder, when fully extended in the A-frame position, reached a height of at least 10-12 feet. The plaintiff knew that the ladder had "Little Giant" written on its side, but he did not recall reading anything else on it. He believes that it was made of aluminum. His testimony indicates that he was using a 22 Little Giant Leveler, Type IA (Extra Heavy Duty, 300 pounds load capacity) (see Deposition Exhibit H).[FN1]

On the morning of the accident, the plaintiff was told by his employer that he would be performing work offsite with his co-worker, Garrett. The two of them first went to a health care facility to make a repair on an existing sign. They drove the company van to the site. He recalled that the van had already been loaded and ready to go. He does not know who loaded the van. He believes that there were two ladders in the van and that they were both the same type of ladder. While at the health care facility, he watched Garrett work. They used a rented lift on the roof of the building. They were provided with a harness to attach themselves to the bucket on the lift. Garrett operated the lift, and they were both inside the lift. 
After completing the job, they had lunch and then drove to the convenience store in Albany. They probably arrived in the afternoon. He recalls it being a clear day. The convenience store was operating. It was a one-story building, with a gas station. He did not know the height of the building. As far as he recalled, the front of the building did not have a sign above the doors. He explained that AJ Sign "had removed the old sign." He believes they were there to prepare the area and paint it before the new sign was installed. He had never previously visited the location to perform work. 
They removed paint supplies from the van and began to set up to paint the building. No one else from AJ Sign was there. The plaintiff testified that they did not have any safety equipment for the work. He did not have a hardhat or request a hardhat. He was not provided with a harness. The plaintiff testified that he did not typically wear a hardhat or use a harness when he used this type of ladder. He had also never requested a harness when he used the ladder in the past. 
When asked who set up the equipment, he testified "Garrett and I both." He could not recall who retrieved the ladder from the van. When asked who set up the ladder that day, he responded, "I can't recall if it was myself or Garrett or a combination of us both." He thinks they "may have agreed to put it" away from the doors to avoid blocking them for customers. 
The ladder was positioned to the left of the main entrance and in front of a white pillar.[FN2]
The work required them to paint at an elevated height (above the doors), to the left of the main entrance, and close to the white pillar. The plaintiff could not estimate how high they needed to work. He explained that the ladder was set up parallel to the building, close enough "to be able to paint and tape the area" of the building while on the ladder. He could not estimate the size of the total work area. He explained that the work area was a "few feet maybe," a "few feet tall." 
The plaintiff testified that the ladder looked stable. It was placed on the sidewalk in the A-shape position. The legs were adjusted to increase the height of the ladder in the A-shape position. The plaintiff made sure the ladder was level, "a good place to put the ladder." He did not observe any defects in the sidewalk or any dirt, debris, or snow around this area. The ladder was also locked into position. The plaintiff checked to make sure that it was locked. The ladder also had footing, anti-slip caps/feet on the bottom of the legs, to provide additional stabilization. [*3]The plaintiff observed Garrett ascend the ladder to obtain a chip of paint from the building. Garrett did not have any difficulties using the ladder. When asked if the ladder was ever moved from the position, he responded, "Not that I can recall."
After the ladder was set up, they realized that the paint they had did not match the building. Garrett called their supervisor, Dave, to let him know. Dave informed Garrett to take the paint chip to a hardware store to obtain the matching paint. The plaintiff was told to remain at the convenience store to apply tape to prepare the area for painting. The plaintiff testified that he had never taped a façade before. He nonetheless understood that he was required to place masking tape around the edges to avoid paint getting on those areas.
While Garrett was away, the plaintiff ascended the ladder and began taping around the edges. At the time, he was 6'1" and approximately 220 pounds. He had just started taping when the accident happened. He had put the tape up "pretty much right in front of where [he] was." He was "doing the parts of the area that [he] could reach from the ladder" which were "right in front of [him]." He was holding a roll of masking tape in his left hand while in the process of affixing the tape with his right hand to the building. He was arm's length from this area on the building, reaching with his right arm to apply the tape to the right of him. He believes his arm was fully extended at that time. He could not recall if one of his hands was touching the ladder at the time. 
When asked how high up his feet were off the ground at the time of the accident, the plaintiff testified that it would be tough to put an exact number on that, but he said, "give or take, 10 feet" (Plaintiff's Dep. Trans. at p. 161). He was standing on the second rung (step) from the top of the A-frame ladder. He was "straddling the ladder." His feet were on the same height rung, but on different sides of the ladder. His feet were approximately shoulder width apart. According to the plaintiff, this was how he normally used the ladder. It was "standard practice" at AJ Sign. 
As he was reaching to apply the tape, the plaintiff "felt the ladder beneath [him] . . . wobble slightly, and then in the blink of an eye . . . the ladder had fallen away from the building [towards the gas pumps], and then [he] fell down . . . face-first onto the sidewalk." The plaintiff denied that he lost his balance. He explained that the ladder "moved" and that "after everything was over, the ladder was [tipped over] on the ground." When asked how the ladder moved, he explained, "all I know is that the ladder moved" and "I just felt the ladder as a whole move." When asked if there were any other factors involved in causing him to fall other than the ladder moving, he explained, "I would say no, no other factors involved." 
The plaintiff did not know why the ladder moved. He was unaware of anything failing on the ladder that caused him to fall. He admitted that he did not observe anything break or malfunction. He also did not experience any problems with the ladder prior to the accident. Nothing was missing on the ladder. He believes the ladder was on an even surface, and he did not have any prior safety concerns about the ladder. He did not feel that it was unsafe to tape the building using the ladder. Based on his experience at AJ Sign, it was standard operating procedure. 
After the accident, the plaintiff called his supervisor (Dave) to let him know that he fell. He also went to the hospital for treatment. He never completed an accident report. Apparently, there are no known witnesses to the accident other than the plaintiff. 

Garrett's Deposition Testimony
Garrett testified that he was 25 years old and had been employed with AJ Sign for [*4]approximately 7 years at the time of his deposition (September 2023). At the time of the accident (December 2020), he was working as a sign installer. He had received safety training for the work. 
Garrett testified that the plaintiff was his co-worker, although he did not know if he had worked with him any other times. He recalled hanging a sign with the plaintiff on a different project on the day of the accident. After that project, they went to the convenience store in Albany. They drove either a pick-up truck or van. He explained that they were going to the convenience store to paint the wall for the shadowing where there was a new sign installed. There was some shadowing on the wall from the old sign and the new sign had already been installed. 
Garrett explained that they needed a ladder, painting supplies, and brushes to complete the project. They had a Little Giant ladder, an A-frame style ladder. At some point, the ladder was set up for the work. He did not remember who set it up. He recalled that it was on the sidewalk, right next to the building, to the left of the doors. He used the ladder before the plaintiff's accident, without any problem. He had never experienced any prior problems with using this type of ladder. Nothing was structurally wrong with the ladder. He did not believe that this project required them to use safety harnesses or safety belts. He did not know the height of the project. They were working above the doors, which he estimated as approximately 8-10 feet high. Other than painting, he thinks they may have been instructed to either place or remove a banner around the new sign. 
Garrett drove to the store to get paint. While gone, the plaintiff was supposed to be masking off the new sign with masking tape to avoid getting paint on it. He did not recall how long he was gone. When he returned, he was told that the plaintiff had fallen and went to the hospital. The ladder was still there, although he could not recall if the ladder was standing or lying on the ground.

 The Incident Report
During his deposition, the plaintiff was shown an incident report, which reads in part, as follows: "Employee was painting the façade, and rather than moving the ladder, he was reaching. He fell." The plaintiff testified that he first saw this report a day prior to his deposition. He did not know the source of the information in the report. The author of the report is identified as Thomas Wheeler, who is an owner of AJ Sign. 
The plaintiff testified that he spoke to Thomas Wheeler the day after the accident. He told Mr. Wheeler that he fell from the ladder. They did not go into detail. The plaintiff did not specifically recall saying that he was reaching. According to the plaintiff, he said that he was applying tape or trying to apply the tape, although he admitted that he did not have a specific recollection of what he said verbatim. When asked if the information in the report was accurate, he disputed that he was painting. He testified that he did not understand the statements about reaching and not moving the ladder. He did not know how Mr. Wheeler obtained that information. 

The Expert Affidavits
In support of the motion, the plaintiff has submitted an expert affidavit from a senior project manager with experience in project safety. The plaintiff's expert concludes that there was a "failure of the ladder in wobbling and tipping" as well as a "failure to have in place proper and sound safety equipment." He notes that the ladder was the only safety equipment supplied for the work and that the plaintiff was not provided with a harness, lanyard, or any anchor tie offs.
He opines that the title owner and tenant "violated Section 240(1) of the Labor Law, and that the violation of this statute was a direct and proximate cause of [the plaintiff's] injuries." Specifically, he opines that the workplace lacked "safety devices . . . in place to protect the plaintiff such as stable and secure ladder, or other safety devices that would have prevented the [plaintiff] from falling." He further opines that the plaintiff was not provided with "the fundamental, minimum standard requirements to give proper protection" and that had "the fundamental and minimum requirements to give proper protection to [the plaintiff] been met in this instance, [the plaintiff] would not have fallen from an elevated height which caused him injury."
In opposition, the title owner and tenant have submitted an expert affidavit from a civil engineer with experience in construction safety and OSHA training ("owners' expert"). This expert opines that wobbling and tipping of an A-frame ladder is not evidence of failure or the lack of proper support, and that slight wobbling is expected of an A-frame ladder and not an indication of any statutory violation. He further asserts that national standards exist to test the acceptable limits of ladder movement, and that no evidence exists that the ladder failed to meet any such testing or that the ladder was defective. 
The owners' expert opines that the plaintiff used the ladder improperly. He emphasizes that the plaintiff was standing on the second step from the top; that the plaintiff was straddling the ladder, with his feet estimated as being approximately 10 feet from the ground, which would have been 3 feet above the allowable height; and that the plaintiff was not holding any part of the ladder with his hands. The owners' expert concludes that this use of the ladder was contrary to the American Ladder Institute Ladder Safety Training for Stepladders, which prohibits straddling the top of the ladder or standing on the top cap, and further warns against overreaching or leaning while working so that users do not fall off the ladder sideways or pull the ladder over sideways. He also opines that the plaintiff could have alternatively used the device as an extension ladder (rather than a stepladder) to safely stand above 6'8".
The owners' expert further opines that the opinions of the plaintiff's expert are conclusory, and that no supportive basis exists for the conclusions asserted by the plaintiff's expert. The owners' expert also notes that the plaintiff's expert failed to inspect the ladder, reference any photographs of the ladder that he reviewed, or apply the criteria set forth by the American Ladder Institute Safe Ladder Practice. He opines that without a proper inspection of the ladder and the application of the proper criteria to the ladder used, the opinions of the plaintiff's expert are worthless and cannot reasonably conclude that the ladder was defective, did not properly function, did not adequately support the plaintiff, or was not the proper safety equipment for the work. 

ANALYSIS
Labor Law § 240 (1) protects workers from elevation-related hazards when they are injured while involved in certain protected work activities, including the painting or altering of a building (see Barnhardt v Richard G. Rosetti, LLC, 216 AD3d 1295 [3d Dept 2023]; Bennett v Savage, 192 AD3d 1243 [3d Dept 2021]). This provision contains a one-sentence mandate requiring owners and general contractors to "furnish or erect, or cause to be furnished or erected . . . scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection" [*5](Labor Law § 240 [1]).[FN3]
The mandate applies to cases involving injuries sustained by workers from falling at elevated heights, as well as from falling objects (see Narducci v Manhasset Bay Assoc., 96 NY2d 259, 267 [2001]). However, "[n]ot every worker who falls at a construction site, and not every object that falls on a worker, gives rise to the extraordinary protections of Labor Law § 240 (1)" (id. at 267; see Van Wormer v Watkins Glen Props., LLC, 140 AD3d 1378, 1379 [3d Dept 2016]). Instead, (1) the owner or contractor must breach the statutory duty to provide a worker with adequate safety devices, and (2) this breach must proximately cause the worker's injuries (see Robinson v East Med. Ctr., LP, 6 NY3d 550, 554 [2006]).
An accident alone is insufficient to establish either of these elements (see Blake v Neighborhood Hous. Servs. of NY City, Inc., 1 NY3d 280, 288-289 [2003]; Van Wormer, 140 AD3d at 1379). These elements are also lacking "if adequate safety devices are available at the job site, but the worker either does not use or misuses them" (Robinson, 6 NY3d at 554; see Borelli v JB IV, LLC, 209 AD3d 1121, 1122-1123 [3d Dept 2022]; see also Vasquez v FCE Indus., 2008 US Dist LEXIS 91767, *26-28 [ED NY 2008], affd 582 F3d 293 [2d Cir 2009] ["New York courts regularly find proximate cause lacking where a worker's own misuse of a defect-free ladder caused the plaintiff's injury."]).
"Rather, there must be proof that the ladder was defective or inadequately secured and that the defect, or the failure to secure the ladder, was a substantial factor in causing the plaintiff's injuries" (Van Wormer, 140 AD3d at 1379 [internal quotation marks and citations omitted]). In cases involving the "collapse or malfunction" of a ladder for "no apparent reason," a rebuttable presumption exists that the ladder was not good enough to afford proper protection (Blake, 1 NY3d at 289 n 8; see Barnhardt, 216 AD3d at 1297-1298). In addition, while the adequacy of a safety device is ordinarily a question of fact, liability may be established as a matter of law "where the unrefuted evidence establishes that the device collapsed, slipped or otherwise failed to perform its function of supporting the worker and his or her materials" (Barnhardt, 216 AD3d at 1297 [internal quotation marks and citation omitted]; see Borelli, 209 AD3d at 1123; Blair v Rosen-Michaels, Inc., 146 AD2d 863, 865 [3d Dept 1989]; Beesimer v Albany Avenue/Route 9 Realty, 216 AD2d 853, 855 [3d Dept 1995]).
Further, if a statutory violation is a proximate cause of an injury, the plaintiff's negligence constitutes only comparative fault, which does not provide a defense to a Section 240(1) claim (see Blake, 1NY3d at 290; see also Morin v Heritage Bldrs. Group, LLC, 211 AD3d 1138, 1140 [3d Dept 2022]; Koenig v Patrick Const. Corp., 298 NY 313 [1948]). In contrast, in cases where there is no finding of a statutory violation, the plaintiff's negligence can be a complete defense as the sole proximate cause of the injury (see Blake, 1 NY3d at 290; see also Kipp v Marinus Homes, Inc., 162 AD3d 1673, 1676 [4th Dept 2018]). As explained in [*6]Blake,
"Under Labor Law § 240 (1) it is conceptually impossible for a statutory violation (which serves as a proximate cause for a plaintiff's injury) to occupy the same ground as a plaintiff's sole proximate cause for the injury. Thus, if a statutory violation is a proximate cause of an injury, the plaintiff cannot be solely to blame for it. Conversely, if the plaintiff is solely to blame for the injury, it necessarily means that there has been no statutory violation" (Blake, 1 NY3d at 290).
On a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party (see Valente v Lend Lease (US) Constr. LMB, Inc., 29 NY3d 1104, 1105 [2017]). To prevail on the motion, a plaintiff must show that the statute was violated, and that the violation proximately caused his or her injury (see Barnhardt, 216 AD3d at 1296). If the plaintiff makes such a showing, the burden then shifts to the defendant, who may defeat the plaintiff's motion "only if there is a plausible view of the evidenceenough to raise a fact questionthat there was no statutory violation and that plaintiff's own acts or omissions were the sole cause of the accident" (Blake, 1 NY3d at 289 n 8; Barnhardt, 216 AD3d at 1297; see Begeal v Jackson, 197 AD3d 1418, 1420 [3d Dept 2021]). 
Here, the plaintiff contends that he is entitled to judgment as a matter of law based on his deposition testimony that the ladder moved for no apparent reason and that no other factors caused him to fall. However, this testimony is refuted by other portions of his deposition transcript indicating that he fell as a result of his use of the ladder in an unsafe manner. Specifically, the plaintiff testified that immediately prior to his fall, his feet were on opposite sides of the ladder, while at a height of approximately 10 feet; that he was standing on the second rungs from the top; that he may not have been holding onto the ladder with either of his hands; and that he was reaching with his right arm, fully extended, trying to affix the tape. His testimony further raises factual issues as to whether he was standing above the permissible height limit [FN4]
and whether he was overreaching.[FN5]
When read as a whole, sufficient evidence exists to find that the accident was caused by the plaintiff's negligence.
Further, the evidence in this case supports a finding (when viewed in the light most favorable to the non-moving parties) that the ladder was adequate and properly placed in [*7]accordance with the statutory mandates. The ladder did not have any apparent defects and was just as secure as any A-frame ladder could be. The ladder was fully opened into the A-frame position and locked securely in place. It also had anti-slip feet and a wide base for additional stabilization. The photographs of the ladder further reveal its quality and stability. In addition, the plaintiff testified that the ladder was placed on a level surface and close enough to perform the work. He denied that he was overreaching. 
Evidence also exists that the nature of the work did not require the ladder to have any additional support. The plaintiff testified that he did not feel unsafe when he was using the ladder and that his co-worker was able to use it, without any problems. In addition, the plaintiff's submissions included the deposition transcript of the co-worker (Garrett), who was an experienced sign installer. He explained that the ladder was the only device needed for the work and that no other devices were necessary. This testimony was based on his prior experience. The plaintiff and his co-worker further testified that the work was not rigorous. Rather, the work simply required the plaintiff to ascend the ladder and place masking tape on either the building or the sign. 
While the plaintiff asserts that a ladder must always remain steady and erect while being used, the plain language of the statute requires only "proper protection" (Labor Law § 240[1]). The statute does not require "perfect" or "absolute" protection, nor does it impose absolute liability whenever a worker chooses to use an unsafe method to perform the work (see Meade v Rock-McGraw, Inc., 307 AD2d 156 [1st Dept 2003] ["That the ladder was inadequately secured was due to plaintiff's improper use of it, which would not give rise to a Labor Law violation"]; see also Bonczar v American Multi-Cinema, Inc., 38 NY3d 1023 [2022] [ladder wobbled]; Nalepa v South Hill Bus. Campus, LLC, 123 AD3d 1190 [3d Dept 2014]; Albert v Williams Lubricants, Inc., 35 AD3d 1115 [3d Dept 2006]; Canino v Electronic Tech. Co., 28 AD3d 932 [3d Dept 2006]; Seredinski v Balaban, 136 App Div 20, 22 [2d Dept 1909] [concluding that "to hold the master liable for the plaintiff's own fault in [not securely placing the ladder] would certainly be an extension of the Labor Law beyond anything contemplated by its framers"]; see also PJI3d 2:217.2 [2023]). 
Contrary to the plaintiff's contention, the statute does not impose an absolute duty on an owner to always make sure that an A-frame ladder is anchored into the ground (a sidewalk), bolted into the wall (on a leased building), or supported with a second set of hands (for non-rigorous work) (see Loretta v Split Dev. Corp., 168 AD3d 823[2d Dept 2019] [judgment affirmed for defendant despite allegation that the ladder was not secure enough to prevent it from toppling over]; Reyes v Khan, 90 AD3d 734 [2d Dept 2011] [questions of fact existed despite allegation that the ladder was inadequately secured]; Meade, 307 AD2d at 156; Spenard v Gregware Gen. Contr., 248 AD2d 868 [3d Dept 1998] [questions of fact existed despite admission that the ladder was not tied or secured to the scaffold in any fashion]). While the statute should be construed as liberally as may be for the accomplishment of the purpose for which it was framed, "the language of Labor Law § 240 (1) must not be strained to accomplish what the Legislature did not intend" (Blake, 1 NY3d at 292 [internal quotation marks and citation omitted]). 
This case is distinguishable from Barnhardt and Sardella, which involved ladders that slipped or collapsed while the plaintiffs were using them in a normal manner (see Barnhardt, 216 AD3d at 1295; Sardella v City of Schenectady, 193 AD2d 914 [3d Dept 1993]). Cases like these stand for the proposition that where a ladder slips or collapses a defendant cannot avoid liability [*8]by speculating that the plaintiff was entirely to blame for the accident based on the mere fact that the plaintiff was the one who secured the ladder (compare Bonczar, 38 NY3d at 1023 [plaintiff acknowledged that he might not have checked the positioning of the ladder or the locking mechanism]; Blake, 1 NY3d at 284 [jury verdict upheld for the defendant where the plaintiff "was not sure if he had locked the extension clips in place"]). Here, in contrast, the evidence regarding the plaintiff's negligence and sole proximate causation is not speculative.
Similarly, this case is also distinguishable from cases where the nature of the work required additional support for the ladder (see e.g. Smith v Pergament Enters., 271 AD2d 870 [3d Dept 2000] [the work required the plaintiff to remove ceiling tiles and cut holes in the sheetrock walls using a saw]; Avila v Saint David's Sch., 187 AD3d 460 [1st Dept 2020] [ladder struck by a piece of falling metal debris during demolition work on the ceiling]). These two cases, together with Barnhardt and Sardella, stand for the proposition that when it is established that a ladder was not secure enough to remain steady during its normal use for the work being performed, the ladder should have been either secured more or additional devices or methods should have been used to properly secure the ladder.[FN6]
Unlike in these other cases, sufficient evidence exists in this case to support a finding (when viewing the evidence in the light most favorable to the non-moving parties) that the plaintiff was using the ladder in an unsafe manner, that the ladder had been properly secured for its normal use, and that the nature of the work did not require any additional safety devices or other measures to provide proper protection.
Moreover, the plaintiff misplaces reliance on Bennett v Savage, 192 AD3d 1243 (3d Dept 2021). There, the Third Department awarded partial summary judgment in favor of a plaintiff who fell from an A-frame ladder while allegedly failing to maintain a three-point safety stance while working on the ladder. Bennett seems similar to Barnhardt and Sardella, as a ladder should remain secure enough to support minor deviations from a three-point stance. Bennett also seems similar to Smith and Avila, as the nature of the work in Bennett seemed to necessitate the use of both hands. In any event, whatever the reason for the decision, Bennett does not provide any support for the plaintiff's position, as a plausible view of the evidence exists in this case to conclude that the plaintiff not only failed to maintain a three-point stance, but he was also straddling the top of the ladder, standing above the highest permissible level, and improperly reaching. 
The facts of this case are similar to other cases which have denied similar motions or otherwise declined to find the defendants liable as a matter of law, including in cases where the plaintiff allegedly fell from a ladder as a result of his or her own negligence in causing it to be unsecured. Some of the cases from the Court of Appeals relied upon by this Court to reach its decision include the following: Bonczar, 38 NY3d 1023 (alleged failure to check the ladder's locking mechanisms); Robinson, 6 NY3d 550 (use of the wrong ladder size); Blake, 1 NY3d 280 (use of ladder with the extension clips unlocked); and Weininger v Hagedorn & Co., 91 NY2d 958 (1998) (standing on the crossbar of a ladder); see also Corrado v Allied Bldrs., 186 Misc 2d 780, 782 (Sup Ct, Monroe County 2000) (discussing the record from Weininger). 
The Court also considers this case to be similar to the following cases from the Third [*9]Department: Morin, 211 AD3d 1138 (alleged failure to use available scaffold properly); Borelli, 209 AD3d 1121 (ladder allegedly used upside down); Nalepa, 123 AD3d 1190 (misuse of A-frame ladder in closed position); Beardslee v Cornell Univ., 72 AD3d 1371 (3d Dept 2010) (contradictory evidence regarding the stability of the ladder and the type and adequacy of the safety devices provided); Roberti v Advance Auto Parts, 55 AD3d 1022 (3d Dept 2008) (failure to set the side bars properly when moving the ladder from one location to the next); Albert, 35 AD3d 1115 (taking an extension ladder apart and using a portion of the ladder which had ends that could not rest flat on the ground); Canino, 28 AD3d 932 (alleged ill-advised application of lateral force to the ladder); and Spenard, 248 AD2d 868 (question of fact existed as to whether the stepladder failed to provide proper protection, thereby precipitating plaintiff's fall, or whether plaintiff simply lost his balance and fell, taking the ladder with him).[FN7]

The Plaintiff's Expert Affidavit
Turning now to the plaintiff's expert affidavit, the opinions are similarly based on the alleged movement of the ladder and ignore the other portions of the plaintiff's testimony which create issues of fact (discussed above). In addition, the opinions regarding the alleged inadequacy of the ladder are speculative, as the expert did not specifically assert that he performed an actual inspection of the ladder or that he reviewed and relied on photographs of the ladder (see Miller v Spall Dev. Corp., 45 AD3d 1297, 1298 [4th Dept 2007]; Kingston v Hunter Highlands, 222 AD2d 952, 954 [3d Dept 1995]). These opinions are also conclusory, as they are rendered in the abstract and fail to include any meaningful explanation in support (see e.g. Cutaia v Bd. of Mgrs. of the 160/170 Varick St. Condo., 38 NY3d 1037, 1038-1039 [2022]; Orellana v 7 W. 34th St., LLC, 173 AD3d 886, 888 [2d Dept 2019]; compare Green v Evergreen Family Ltd. Partnership, 210 AD3d 1496 [4th Dept 2022] [unrefuted expert opinion that the eight-foot A-frame ladder provided to plaintiff was inadequate because it could not have been placed so as to provide proper protection to the plaintiff during his work on the bearing and shaft of a car wash overhead door]).
Similarly, the expert's opinions regarding the alleged failure to furnish additional safety devices fail to address the particular facts of this case or provide any basis to conclude, as a [*10]matter of law, that the ladder was inadequate by itself, that these additional safety devices were necessary, and that these additional devices could have prevented the plaintiff's fall under the circumstances of this case (see Cutaia, 38 NY3d at 1038-1039; Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 340 [2011] [holding that to prevail on summary judgment, a plaintiff must establish that a safety device could have prevented his fall]; Hartigan v Gilbane Bldg. Co., 228 AD3d 487, 488 [1st Dept 2024] ["Whether a device of the sort contemplated by the statute could have prevented plaintiff's fall presents a question of fact"]; Albert, 35 AD3d at 1116 [holding that where the safety device furnished is adequate, a defendant is not required to furnish additional, redundant safety devices]).
Indeed, the expert concludes, without explanation, that "other safety devices" (whatever they may be) would have protected the plaintiff. Even assuming the expert was referring to a specific safety device (e.g., a harness, lanyard, or an anchor tie off), this is just a conclusory opinion (see Cutaia, 38 NY3d at 1038-1039 [holding that the plaintiff's expert affidavit did not meet the plaintiff's burden of establishing proximate cause as a matter of law, where the expert opined in a conclusory manner that other safety devices could have protected plaintiff from his fall]; see also Ortiz, 18 NY3d at 340; Kipp, 162 AD3d at 1675 [rejecting the plaintiff's speculative assertions that the ladder was not an adequate safety device, and that other, unavailable safety devices were necessary to prevent his injuries]; Albert, 35 AD3d at 1116-1117).
In any event, the issues of whether an alternative or additional device of the type specified in the statute was required or could have prevented a plaintiff's fall ordinarily raise a question of fact. Based on the limited information set forth in the plaintiff's submissions, the Court cannot find that the failure to provide these alternative devices was a per se violation of the statute (see Blair, 146 AD2d at 865; Bland v Manocherian, 93 AD2d 689 [1st Dept 1983] [holding that the trial court "erred when it equated the failure to provide plaintiff with a safety belt with a per se violation" of the statute]; see also Hartigan, 228 AD3d at 488).
The Plaintiff's Reason for Misusing the Ladder
Further, the plaintiff contends that he did not know how to safely use the ladder and that he had a good reason to use the ladder in this unsafe manner based on an alleged standard practice (see Biaca-Neto v Boston Rd. II Hous. Dev. Fund Corp., 34 NY3d 1166, 1167-1168 [2020]; see also DeGraff, 202 AD3d at 1299-1300; Georgia v Urbanski, 84 AD3d 1569, 1570 [3d Dept 2011]; see also PJI3d: 2:217.2 [2023]). This contention, however, is based solely on selected portions of the plaintiff's deposition transcript, which essentially consist of either general denials or general responses to very general questions. When asked about the standard practice, for example, the plaintiff testified, as follows:
"Q. I just want to go back to where you said that you were straddling the ladder. Did anyone ever instruct you to stand on the ladder that way?
A. Yeah. That was the way that the ladders were commonly used there. I'm not sure if anyone at any point had  like I said, there was no, like, formal training, but that's the way that I used it and I had seen others use it. So that's kind of just like the standard practice with those ladders because they have, like, the steps on both sides. So it allows you to do that instead of like  you know.
Q. So is that how you would normally stand on that type of ladder when you needed to be at that height? A. Yes.
Q. And had you previously stood that way when performing work for AJ Sign? A. Yes, [*11]frequently. Yeah.
Q. And did anyone ever tell you not to stand that way on the ladder at that height?
A. No." (Plaintiff's Dep. Trans. at pp.89-90)
Nothing in the plaintiff's motion papers corroborate his general (self-serving) testimony on these issues or indicates how AJ Sign or any of the plaintiff's co-workers will testify on these issues. This general testimony is further called into question by other parts of the plaintiff's submission, including evidence that the plaintiff and his co-workers were trained and knew or should have known about proper safety rules for ladders. Specifically, the plaintiff received OSHA training; he regularly used the ladder for months prior to the accident, without incident; he had also previously observed up to 10 workers from AJ Sign using the ladder; the ladder had a notice affixed to it, warning against standing above 6'8"; and the plaintiff's co-worker also received safety training. Moreover, although the plaintiff testified that he was not provided with any instructions about how to use the ladder on the day of his accident, Section 240(1) does not require a worker to receive instructions on the same day as the accident (see e.g. Cahill v Triborough Bridge & Tunnel Auth., 4 NY3d 35 [2004]).
Accordingly, the limited and conflicting evidence presented on this motion does not establish as a matter of law that the plaintiff was truly ignorant of basic safety rules for this basic device (an A-frame ladder) or that he had a "good reason" to misuse the ladder (see e.g. Biaca-Neto, 34 NY3d at 1168 [holding that questions of fact existed regarding a plaintiff's alleged reliance on an unsafe "accepted practice"]). Nonetheless, the plaintiff and the other parties (including AJ Sign and Stratus) will have an opportunity to develop the record further at trial. For these same reasons, although the plaintiff testified that he had never used the device as an extension ladder before, the Court will need to wait to hear the trial evidence prior to determining whether the plaintiff's non-use of the device as an extension ladder may be submitted to the jury for consideration on the issue of sole proximate causation. 
Procedural Issues
As a procedural matter, the plaintiff has failed to satisfy his initial burden on this motion, as his own submissions raise triable issues of fact as to whether the ladder provided proper protection and whether the plaintiff's misuse of it was the sole proximate cause of his injuries (see Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985]; Yao Zong Wu v Zhen Jia Yang, 161 AD3d 813 [2d Dept 2018] [the plaintiff's own submissions demonstrated that questions of fact existed]; Militello v Landsman Dev. Corp., 133 AD3d 1378 [4th Dept 2015]; Grove v Cornell Univ., 75 AD3d 718 [3d Dept 2010], mod on other grounds 17 NY3d 875 [2011]; Destefano v City of New York, 39 AD3d 581 [2d Dept 2007]; Spenard, 248 AD2d at 868 [reading the plaintiff's deposition testimony and affidavit as raising a legitimate factual issue]). As explained above, even without considering the opposition papers, a plausible view of the evidence exists to conclude that the owners did not breach their statutory duty under Section 240(1) to provide "proper protection" and that the plaintiff was entirely responsible for his own injuries. Moreover, consideration of the opposition papers would not change the outcome of this motion, as they provide only further support for these conclusions. 
Notwithstanding, consideration of the opposition papers would raise two additional issues. First, the opposition papers allege that the plaintiff was overreaching, which raises a potential issue regarding the ladder's placement. While this issue could perhaps favor either side at a trial in some manner, it does not provide sufficient grounds to grant the motion, as it [*12]involves questions of fact and credibility.[FN8]
The plaintiff, for example, does not allege on this motion that the ladder was improperly placed. He has also denied that he was overreaching. His testimony also indicates that the ladder was properly placed and that he was engaged in other forms of negligence as well, beyond just normal reaching.
Second, as explained above, the plaintiff's submissions were insufficient to establish, as a matter of law, that the plaintiff was ignorant of basic safety rules and had a good reason to misuse the ladder. Consideration of the entire record does not change this result, but rather confirms that the facts are too undeveloped to resolve these issues at this time (see CPLR 3212[b]; Miro v Plaza Constr. Corp., 9 NY3d 948, 949 [2007] [limited record]; Canino 28 AD3d at 932 [limited record]). In fact, the owners' submissions indicate that they were not involved in the plaintiff's training and that they lack personal knowledge regarding AJ Sign's safety practices. As the case is already proceeding to trial on these same issues as against Stratus and AJ Sign, it would not be prudent to make any binding determinations as against the owners on these issues without first considering the trial evidence. Otherwise, a contrary procedure would have the potential to produce inconsistent results, confuse the jury, and arguably permit a party to prevail based on his own self-serving statements rather than on the merits, especially as the other parties rather than the owners possess the relevant knowledge on these particular issues (see e.g. Quiroz v 176 N. Main, LLC, 125 AD3d 628, 631 [2d Dept 2015]; Szot v Saridis, 204 AD2d 885, 886 [3d Dept 1994]).
Tenant as a Proper Party
The Court further reaffirms its ruling at oral argument that the tenant is a proper party under Section 240(1). In support of the motion, the plaintiff submitted evidence demonstrating that the tenant acted as the owner and therefore could be treated as an owner for purposes of Section 240(1). Among other things, the tenant requested the work; benefitted from it; had possession over the property when the work was performed; and did not object to the work being performed by the plaintiff (see e.g. Rizo v 165 Eileen Way, LLC, 169 AD3d 943, 946 [2d Dept 2019]; Alexander v Hart, 64 AD3d 940, 942-943 [3d Dept 2009]; Kwang Ho Kim v D & W Shin Realty Corp., 47 AD3d 616, 618 [2d Dept 2008]; 1B NY PJI3d 2:216, at 324 & 330 [2023] [explaining that the term "owner" "is not limited to title holders" and may encompass "a lessee who contracted for or otherwise has the right to control the work"]). 
In opposition, the tenant failed to raise a question of fact on this issue. While the tenant used a third party (LSI) to make the arrangements for the work, this does not absolve the tenant from potential liability, as the tenant authorized the third party to contract for the work. Moreover, it is well settled that an owner or general contractor may not avoid liability under Section 240(1) by delegating the work (see 1B NY PJI3d 2:216, at p. 334 [citing Kingston v Hunter Highlands, 222 AD2d 952 (3d Dept 1995)]).
It is therefore,
ORDERED, that the plaintiff's motion seeking partial summary judgment is DENIED, [*13]except the Court finds that Defendants 1455 Washington Avenue LLC and 7-Eleven, Inc. are proper parties under Section 240(1) of the Labor Law; and it is further
ORDERED, that the parties' counsel shall appear for a pre-trial settlement conference in person at the Saratoga County Courthouse (with the plaintiff in person and the adjusters readily available by telephone) on April 22, 2025 at 10:00 a.m. Counsel should be prepared at the conference to discuss settlement, provide the Court with a witness list, discuss the anticipated number of days required to conduct the trial, and schedule a date certain for trial. 
This shall constitute the Decision and Order of the Court. No costs are awarded to any party. The Court is hereby uploading the original decision into the NYSCEF system for filing and entry by the County Clerk. The Court further directs the parties to serve notice of entry in accordance with the Local Protocols for Electronic Filing for Saratoga County.
So-Ordered.
Dated: January 13, 2025
at Ballston Spa, New York
HON. RICHARD A. KUPFERMAN
Justice Supreme Court
Papers Considered:
NYSCEF Doc. Nos.: 80-103, 107-119

Footnotes

Footnote 1:During his deposition, the plaintiff was shown a photograph of what appears to be a manufacturer's notice affixed to the ladder. The notice advises users that the size of the ladder (adjustable) ranges between 5'6" to 9'6" when used as a stepladder and between 11 feet to 19 feet when used as an extension ladder. The notice also advises that the "highest standing level" ranges between 2'11" to 6'8" when used as a stepladder and between 7'10" to 15'6" when used as an extension ladder.

Footnote 2:The motion papers do not include the photographs of the building/signs marked as exhibits during the plaintiff's deposition. A complete set of the deposition exhibits are nonetheless contained in the Court's file from the prior motion (see NYSCEF Doc. No. 61, at pp. 230-239).

Footnote 3:This sentence reads in full, as follows:
 "All contractors and owners and their agents, except owners of one and two-family dwellings who contract for but do not direct or control the work, in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed" (Labor Law § 240 [1]).

Footnote 4:While the plaintiff did not know if he was standing above the highest permissible height, the record indicates that the legs of the ladder were fully extended (adjusted) to increase the height of the ladder in the A-shape position to a maximum height of 9'6" and that the plaintiff was standing on the second rung from the top, which appears to be above the highest permissible height for standing (6'8"). In any event, this fact, which can easily be ascertained with a measuring tape, must be resolved in favor of the defendants on this motion, as they are the non-moving parties.

Footnote 5:The record is undeveloped on this issue, as neither side has identified the source of the information in the incident report prepared by Mr. Wheeler or otherwise provided any measurements to support a finding that the plaintiff was overreaching (e.g., by considering the plaintiff's height, the length of his arm, and the distance between his position on the ladder and the taping area).

Footnote 6:Even these circumstances do not necessarily constitute a statutory violation, as the prerequisites for lability "do not exist if adequate safety devices are available at the job site, but the worker either does not use or misuses them" (Robinson v East Med. Ctr., LP, 6 NY3d 550, 554 [2006]).

Footnote 7:The following cases from the other departments are also particularly instructive: Militello v Landsman Dev. Corp., 133 AD3d 1378 (4th Dept 2015) (failure to lock wheels under the scaffold); Daley v 250 Park Ave., LLC, 126 AD3d 747 (2d Dept 2015) (alleged mispositioning of the ladder); Reyes v Khan, 90 AD3d 734 (2d Dept 2011) (work performed with ladder in an unnecessarily dangerous manner); Thome v Benchmark Main Tr. Assoc., LLC, 86 AD3d 938 (4th Dept 2011) (operating lift in an area with holes while looking at the ceiling); Destefano v City of New York, 39 AD3d 581 (2d Dept 2007) (alleged leaning of the ladder up against a mobile unit rather than opening it up); Meade v Rock-McGraw, Inc., 307 AD2d 156 (1st Dept 2003) (using A-frame ladder in a closed position); Anderson v Schul/Mar Constr. Corp., 258 AD2d 605, 607 (2d Dept 1999) (descending the ladder while holding a coffee and donut); and Skalko v Marshall's Inc., 229 AD2d 569 (2d Dept 1996) (plaintiff swung his body off the scaffold); see also Loretta v Split Dev. Corp., 168 AD3d 823 (2d Dept 2019) (questions of fact existed regarding whether the ladder provided adequate protection and, if not, whether such failure was a proximate cause of the injuries).

Footnote 8:In this Court's view, the resolution of an overreaching case requires consideration of several factors, including the reason for the reaching, the extent of the reaching, the burden of repositioning the ladder, and whether the "normal and logical response" would have been to simply reposition the ladder (see Montgomery v Fed. Express Corp., 4 NY3d 805, 806 [2005]; Blake v Neighborhood Hous. Servs. of NY City, Inc., 1 NY3d 280 [2003]).